UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SUPREME RICE, L.L.C.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 2:20-cv-1212** |
| **TURN SERVICES, L.L.C.** | **SECTION "E"** |
| | **JUDGE BARRY W. ASHE** |
| | **MAG. JUDGE MICHAEL NORTH** |

### TURN SERVICES, L.L.C.'S MEMORANDUM IN OPPOSITION TO SUPREME RICE, L.L.C.'S MOTION FOR SUMMARY JUDGMENT (R. DOC. 62)

**NOW INTO COURT**, through undersigned counsel, comes Defendant Turn Services, L.L.C. ("Turn"), which submits this Memorandum in Opposition to Plaintiff Supreme Rice, LLC's ("Supreme") Motion for Summary Judgment against Turn (**R. Doc. 62**).

### I. A Fleeter's Duty Is Limited to the Barge; Turn Had No Duty to Protect Cargo.

Turn agrees that a fleeter's duty is limited to securely mooring the barges. *See*, *Jantran, Inc. v. M/V SANDRA W*, 1994 WL 1890905, *4-5 (N.D. Miss. Dec. 2, 1994); s*ee also,* (**R. Doc. 62-1** at p. 8, ¶ 2). As discussed in Turn's pending Motion for Summary Judgment (**R. Doc. 57**), a fleeter is a "**limited bailee** and his liabilities depend **exclusively on the obligations which he has himself undertaken** in his contract with the owners of vessels entrusted to his care." *See*, (**R. Doc. 57-1** at p. 5) (*citing*, *Noonan Const. Co. v. Federal Barge Lines, Inc.*, 453 F. 2d 637, 640 (5th Cir. 1972)). Thus, a fleeter's duties are limited to only those which were expressly agreed to between the parties. *Noonan Const. Co. v. Federal Barge Lines, Inc.*, 453 F. 2d 637, 640 (5th Cir. 1972); *see also*, *John I Hay Co. v. The Allen B. Wood,* 121 F. Supp. 704, 707-08 (E.D. La. May 25, 1954). A fleeter is "not an insurer of the barges … entrusted to its care; it [the

4848-9212-0301 v1

fleeter] was, however, a bailee for hire and was required to see to it that **the barges** were adequately moored at all times." *Dow Chemical Co. v. Barge UM-23B*, 424 F.2d 307, 311 (5th Cir. 1970) (emphasis added).

Turn did not have a written agreement with Supreme or SCF to fleet the SCF barges. Such is undisputed. Turn's duty was limited to adequately mooring the barges in its fleet. *M/V Admiral Bulker v. United Bulk Terminals Davant*, 397 F. Supp. 3d 826, 836 (E.D. La. June 19, 2019) (**Ashe, J**.) (*citing*, *Congra, Inc. v. Weber Marine, Inc.*, 2000 WL 943198, *5 (E.D. La. July 7, 2000). It remains undisputed that such was done: the barges were adequately moored in the fleet. Neither Supreme nor SCF provided Turn with any instructions or specifications as to how the Barges should be fleeted.

Supreme attempts to convince this Court that Turn's duty to the Barges was to insure Supreme's cargo and to protect the milled rice against any potential risk, including airborne contamination; however, Supreme fails to offer any evidence that Turn agreed to expand its limited duty of securely mooring the Barges in its 'parking lot.' Turn had no duty to guarantee the safety of the Barges' milled rice cargo.

Supreme cites *Noonan* as the basis for its argument. In *Noonan*, Federal Barge Lines operated an open fleet. *Noonan Const. Co. v. Federal Barge Lines, Inc.*, 453 F. 2d at 638. Ideal, a cement terminal operator, loaded a barge with cement. *Id.* at 639. Ideal fleeted the loaded barge in Federal's fleet to clear space at its dock. *Id.* During the night, the loaded barge sunk while in the fleet, which resulted in a total loss of the cement cargo. *Id*. The Fifth Circuit held that Federal Barge Lines breached its duty to securely moor the loaded barge and to provide a watchman that could recognize danger to alert the owner that the barge was in distress. *Id.* at 640-41. The watchman failed to notice the sinking, which an expert opined took four hours. The watchman

made rounds twice during that same window of time; he should have recognized the barge's perilous condition. *Id.* Therefore, because Federal's watchman breached his duty to the barge, it was liable for damages to the barge and the loaded cargo. *Id.*

Federal's liability to the cargo arose only because the fleeter failed to recognize the barge's hull damage. In the absence of any physical damage to the barge, there would be no liability for the barge's cargo. *Id.*

The present lawsuit is starkly different. Turn's obligation was to securely moor the Barges in its fleet. It is undisputed that such was done. Supreme alleges that damage to the Barges' cargo is Turn's responsibility even though Turn's duty is limited to securely mooring barges in its fleet.

In Response to Turn's Interrogatory No. 11, SCF testified that its Barges suffered no physical damage. *See*, **Exhibit "1"** - SCF Answer to Interrogatory No. 11. Supreme's alleged expert, Ms. Gillespie of 3D Marine, testified that none of the Barges "suffered any physical damages while they were in" Turn's fleet. *See*, **Exhibit "2"** – Depo. of Gillespie at p. 39, lines 17-20. In fact, Ms. Gillespie testified that any coal dust that might have been on the exterior of the Barges was washed off by rain before the May 3, 2019 inspection by RMG. *Id*. at p. 39, lines 20-25.

Turn cannot be liable for Supreme's alleged cargo damages if the Barges' hulls were undamaged. The Barges did not breakaway from the fleet; the Barges did not sink. The Barges remained securely moored and Barges' hulls did not sustain damage. Federal Barge Lines was only liable for the loaded cement cargo because Federal was also liable for the physical damage to the barge that sunk. Therefore, Supreme's argument that *Noonan* provides the legal basis for its damages is without merit. Turn owed no duty to Supreme's cargo.

3

II.     **Supreme Has Failed to Identify The Source of the Contamination.**

The source of the coal contaminant is unknown and unknowable.

Following the April 17, 2019 inspection by Russell Marine Group ("RMG"), samples of the coal contaminant were taken from the SCF Barges by RMG and sent to Anastas Technical Services ("Anastas") in Houston, TX for analysis. *See*, **Exhibit "2"** – Depo. of Gillespie, dated April 30, 2021, p. 41, lines 13-20. No samples were taken from the alleged open hopper barges in Turn's fleet. *See*, **Exhibit "3"** – Depo. of Hobbs at p. 62, lines 11-12.

RMG's operations manager, Jonathan Hobbs, testified that RMG did not take any samples from the alleged open hopper barges in Turn's fleet for sample comparison purposes; RMG did not take samples from the two nearby large coal / petcoke terminals immediately adjacent to Turn's MG Fleet. *See*, **Exhibit "3"** – Depo. Jonathan Hobbs at p. 64, lines 9-13. RMG only took samples of the contaminant in the Barges. *See*, **Exhibit "3"** – Depo. Jonathan Hobbs at p. 62, lines 11-12.

Below is an annotated photograph of the Myrtle Grove area. *See*, **Exhibit "4"** – Area Screenshot of MG Area, Supreme Rice 000049 (annotated for reference). Turn's MG Fleet is circled in pink on the East Bank of the Mississippi River; downriver from the fleet is Host's Davant coal/petcoke terminal, which is outlined in orange; Host's massive black mounds of coal / petcoke are easily visible. Directly across the River from Turn's MG Fleet, on the West Bank, is International Marine Terminals' ("IMT") coal/petcoke terminal:

4848-9212-0301 v1



Turn's fleeting expert, Mr. Bill Harding, testified that he identified *at least* five potential sources of the contamination. *See*, Exhibit "5" Depo. of Bill Harding at p. 90, lines 1-5. Those sources include the IMT coal / petcoke terminal, Host's Davant Coal / Petcoke Terminal, and the respective fleets at each such facility. This is in addition to potential contamination of the Barges while under tow by SCF's third-party towers downriver to the MG Fleet. However, Mr. Harding testified that it is impossible to determine the source of the contamination given the lack of information and samples obtained by Supreme's representatives. *See*, Exhibit "5" Depo. of Bill Harding at p. 141, lines 10-17.

3D Marine, representatives of Underwriters for Supreme, engaged Anastas to analyze the samples taken from the Barges by RMG in order to identify the specific contaminant found in the Barges: "Anastas was retained to extract at a molecular level the contamination on the rice grains themselves and try to identify" the dust contaminant. *See*, **Exhibit "2"** – Depo. of Gillespie, dated April 30, 2021, p. 41, lines 7-12.

5

Anastas analyzed the contaminant sample and produced results that the contaminant was an 89.7% match to <u>coal tar pitch</u>. *Id.* at p. 41, lines 21-24. Coal tar pitch is coal. Mr. Brent Moore, a chemist hired by Anastas, who shares office space with Anastas, testified that the sample was likely coal; "It had a high Hit Quality Index, which is the HQI …. **It was relatively high**, because it was 89%, if I remember correctly. But I can check that real quick. 89.7%. *See***, Exhibit "6"** – Depo. Brent Moore at p. 17, lines 24 – 25; p. 18, lines 2-4. The RMG sample was compared to other reference samples in Mr. Moore's database, but the best match was to coal tar pitch. *Id.* at p. 18, lines 10-18.

In an email dated **May 9, 2019 at 2:21pm**, Mr. Moore conveyed his findings to Anastas that he determined that the RMG sample from the Barges was an "89.70% match with a coal tar pitch reference spectra." *See*, **Exhibit "7"** - *See*, Subpoena Resp. from Anastas, bates labeled ANASTAS TECHNICAL SERVICES – 000022. Anastas then advised 3D Marine of the findings in an email dated **May 9, 2019 at 5:53pm**:

> I have attached the preliminary analysis of one of the two samples submitted to attempt to determine if the material was coal or pet coke … Once we got a look at the samples we decided we needed to perform an extraction using an organic solvent to concentrate the material for analysis. This extract was analyzed via FTIR using diamond ATR which resulted in a quality spectra and a 89.70% match with coal tar pitch reference spectra. **Had the material been pet coke we would would (sic) not been able to extract hardly any organic material at all. Pet coke is usually fully extracted and is basically just Carbon and inorganics.** We have also analyzed the particles via Pyrolysis GCMS so we can use the GCMS patter for comparison purposes … from the other barge.

*See*, **Exhibit "7"** - Subpoena Resp. from Anastas, bates labeled ANASTAS TECHNICAL SERVICES – 000013 (emphasis added). Enclosed within the same correspondence was a copy of the FTIR analysis compared to coal tar pitch. Note the HQI of 89.7% that Mr. Moore

6

discussed in his deposition. *See*, **Exhibit "7"** - Subpoena Resp. from Anastas, bates labeled ANASTAS TECHNICAL SERVICES – 000013; 000020.

3D Marine's Manger, Joanne Gillespie, testified that Anastas and its chemist, Mr. Moore, determined that the contaminant found in the barge was coal:

> They considered it, it was coal. It was a 89.7% match for coal. And I'm looking at the quote. The lab said that had it been petcoke, they would not have been able to exactly extract hardly any organic material. It's not usually fully extracted, and it's basically just carbon and organic (sic).[1] So it was my understanding that their analysis revealed this [sample] to be coal rather than petcoke.

*See*, **Exhibit "2"** – Depo. of Gillespie, dated April 30, 2021, p. 42, lines 9-18.

Ms. Gillespie, on behalf of 3D Marine, then represented to the FDA that the contaminant was identified as coal; this fact is important because 3D Marine mitigated its damages based on this fact: a food grade cargo was contaminated with coal; it was not contaminated with a petroleum coke. This fact was accepted by the FDA, which advised as to the appropriate course of action. *See*, **Exhibit "8"** – FDA correspondences between 3D Marine.

Remediation efforts commenced; 3D Marine arranged for a public bid on the contaminated milled rice; 3D Marine notified each of the bidders that this milled rice was contaminated with coal. *See*, **Exhibit "2"** – Depo. of Gillespie at Exh. 2. In sum, in 2019, Supreme, its insurance's representatives, 3D Marine, along with its contracted laboratory and chemist all opined that the RMG sample of the contaminant from the Barges was coal.

In discovery, Turn produced barge survey reports from April 8, 2019 that were drafted by Sabine Surveyors, LTD for MG Transport. MG Transport owned those barges; such were fleeted in Turn's fleet in April 2019. Sabine, an independent, third-party, marine surveyor, surveyed the

---

[1] There appears to be an error in the transcript; Ms. Gillespie testified that "it's basically just carbon and inorganic," which is not reflected in the transcript. No errata sheet has been returned at this time.

MG barges and found that each was transporting Green Delayed Petcoke. *See*, **Exhibit "9"** – Sabine Surveys, Turn 001353- 1360. These were open hopper barges were fleeted adjacent to the SCF Barges in Turn's MG Fleet. None of the MG barges contained coal. *Id.*

After Supreme discovered that the laboratory analysis performed by Mr. Moore and Anastas, which matched the RMG contaminant sample to coal, did not align with the independent survey reports from Sabine (petcoke), Supreme scrambled to have Mr. Moore manipulate his data to conform his original 2019 opinion to now include the possibility that the contaminant may have been petcoke. Recall that on May 9, 2021, Anastas expressly stated: "**Had the material been pet coke we would would (sic) not been able to extract hardly any organic material at all. Pet coke is usually fully extracted and is basically just Carbon and inorganics**." *See*, **Exhibit "7"** - Subpoena Resp. from Anastas, bates labeled ANASTAS TECHNICAL SERVICES – 000013 (emphasis added).

From May 9, 2019 – May 2019,[2] for more than two years, Supreme, RMG, Anastas, and the FDA all said that the sample taken from the SCF Barges was coal. This was based on Moore's chemical analysis. However, after discovering that the MG Transport barges in Turn's MG Fleet did not contain coal (they transported petcoke), Supreme, through its 3D Marine representatives, requested and convinced Mr. Moore to change his original data:

> Q: Well, from what you have explained to me, it seems as though you were trying to manipulate your original data to try and get more similar matches to a different compound than that which was originally determined [coal tar pitch]?
>
> A: Manipulation of data would imply that I changed the original spectra. **I am just reinterpreting my data**.

*See*, **Exhibit "6"** – Brent Moore Depo. at p. 66, lines 17-21; p. 67, lines 2-4 (emphasis added).

---

[2] *See*, **Exhibit "6"** – Moore Depo. at p. 54, lines 6-11: Mr. Moore testified that he was contacted by Ms. Gillespie of 3D Marine within two weeks of his May 24, 2021 deposition to "reinterpret" his original chemical analysis.

8

Mr. Moore testified that his "reinterpretation" was not a manipulation; it was a new way to look at the original data. For his revised analysis, Mr. Moore decided to only examine and compare certain portions of the RMG sample spectra to those contained in his database. He did not reexamine the original RMG samples. *See*, **Exhibit "6"** – Depo. of Moore at p. 67, lines 6-8.

Essentially, it's as if Mr. Moore was tasked with the responsibility of identifying the artist of a painting. His initial hypothesis as the artist's identity was proven wrong and he was determined to prove himself correct; but, now, instead of looking at the entire painting, the examiner only observes the bottom right corner of the painting. What was originally a landscape similar to Monet's work may now have similarities to a Jackson Pollock – because you're only looking at one specific portion of the canvas. Mr. Moore reduced his scope of analysis – reducing his field of view – to only compare certain portions of the RMG spectra sample to those contained in his database of reference spectras. *See generally*, **Exhibit "6"** – Brent Moore Depo. at p. 69 -71. Mr. Moore's latest opinion is that the contaminant could be either coal or petcoke; however, he admits that even with his recent "reinterpretation," the coal tar pitch (coal) reference spectra remained the highest HQI. *See*, **Exhibit "6"** – Depo. of Moore at p. 49, lines 23-25.

Supreme has no information that there were any coal barges in Turn's MG Fleet from April 6, 2019 (date Barges fleeted) – April 17, 2019 (time of RMG's inspection). Supreme has no information as to the source of the contamination. In *Cargill Fertilizer, Inc. v. PEARL JAHN O/B, et al.*, a case similar to the present lawsuit, Cargill sued a variety of defendants for contamination to its cargo of monocalcium phosphate. *Cargill Fertilizer, Inc. v. PEARL JAHN O/B, et al.*, 190 F. Supp. 2d 894, 895 (E.D. La Feb. 21, 2002) (Fallon, J.). An ocean-going vessel travelled from Tampa, FL to Davant, LA to a location near Turn's Myrtle Grove fleet. *Id.* at 896-97. Associated Terminals utilized its mid-stream anchorage to transfer Cargill's phosphate cargo

9

to inland river barges for further transport upriver to Illinois. *Id.* After loading, the barges were fleeted at IMT's facility, which is directly across from Turn's MG Fleet, for several days. *Id.* at 896. Thereafter, the loaded barges were pushed upriver to Cargill's facility; the cargo was unloaded. *Id.* at 897. During the unloading process, Cargill discovered that its cargo was contaminated with iron. *Id.*

Cargill alleged that a bobcat sweeper lowered into the ocean-going vessel's cargo hold was the source of contamination. *Id.* Evidence suggested that the sweeper was previously placed into cargo holds of ships handling either HBI, pig iron, coal, or iron ore pellets in the days prior to unloading Cargill's cargo. *Id.* at 898.

The court held that "in a claim for damage to cargo caused by negligent acts of a non-carrier, the plaintiff has the burden of establishing: (1) that the defendant has a duty to guard against the damage caused; (2) that the defendant breached that duty by engaging in conduct that fell below the applicable standard of care; (3) that the negligent conduct was a cause in fact as well as the proximate cause of the damage; and (4) that there was actual loss, injury or damage suffered by the plaintiff." *Id.* at 898.

Applying this standard, Judge Fallon held that plaintiff failed to meet its burden of establishing the source of the contamination and, therefore, Cargill was unable to carry its burden of proof. *Id.* The Fifth Circuit affirmed Judge Fallon's holding. *See*, *Cargill Fertilizer, Inc. v. PEARL JAHN OB*, 70 Fed. Appx. 780, 784 (5th Cir. 2003).

The same rationale is applicable to the present lawsuit. First, Supreme has failed to establish that Turn owed a duty to protect Supreme's cargo from airborne contamination. Turn's duty is limited to securely mooring the barge. Second, **Supreme does not know the source of contamination**. Supreme alleges that barges containing petcoke in Turn's MG fleet are the

source of contamination; however, this allegation is pure assumption. Supreme took no samples from any of the petcoke barges that were fleeted in Turn's Fleet during April 2019. Supreme took no samples from the surrounding coal / petcoke terminals. Thus, Supreme has no data to compare to the RMG samples taken from the Barges. *See*, **Exhibit "3"** – Hobbs Depo. at p. 62, lines 10-12.

Additionally, Supreme's surveyors drafted either reports without performing an inspection. Within those reports, each opined as to the specifics of the fleet and its conditions. However, neither had performed their surveys at the time of drafting. *See*, **Exhibit "2"** – Depo. of Gillespie at p. 13, lines 22-25; p. 14, lines 1-6; *see also*, **Exhibit "3"** – Depo. of Hobbs at p. 66, lines 8-25; p. 67.

In fact, 3D Marine, Supreme's underwriting representatives, had a sample of the contaminated rice cargo chemically analyzed by Mr. Moore. The purpose was to identify the black dust contaminant found in/on the Barges. In 2019, Mr. Moore opined that the contaminant was coal. However, after discovering that there were no coal barges in Turn's MG Fleet at the time of the alleged contamination based on the MG Transport Survey Reports, Mr. Moore was asked to "reinterpret" his analysis. However, despite these efforts, Mr. Moore was still unable to opine that the RMG sample taken from the Barges was not coal.

Turn has no duty to prove the source of the alleged contaminant. Such is the Plaintiff's burden. *See*, *Cargill Fertilizer, Inc. v. PEARL JAHN OB*, 70 Fed. Appx. 780, 784 (5th Cir. 2003). Supreme has failed to meet its burden; therefore, Turn requests that this Court deny Supreme's Motion (**R. Doc. 62**).

### III. The Barges Were Not Fit to Transport Milled Rice; They Were Unseaworthy.

In *M/V Admiral Bulker v. United Bulk Terminals Davant*, this Court held that "A barge owner has a 'continuing and **nondelegable** duty' to deliver a seaworthy barge to a fleeter." *M/V Admiral Bulker v. United Bulk Terminals Davant*, 397 F. Supp. 3d 826, 835 (E.D. La. June 19, 2019) (*citing*, *Congra, Inc. v. Weber Marine, Inc*., 2000 WL 943198, at *4 (E.D. La. July 7, 2000) (citation omitted)) (**Ashe, J.**). An unseaworthy vessel is one that is not "**reasonably fit and safe for the purposes for which it is to be used**." *Id.* (*citing, Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002) (*quoting, Jackson v. OMI Corp*., 245 F.3d 525, 527 (5th Cir. 2001))). The issue of seaworthiness is a question of fact to be decided by the trier-of-fact. *See*, *Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 98 (1944); *Luckenbach v. McCahan Sugar Co.*, 248 U.S. 139, 145(1942); *see also*, *Marshall v. Ove Skou Rederi A/S*, 378 F. 2d 193, 196 (5th Cir. 1967).

Supreme shipped its milled rice cargo with covers for a purpose: to protect the cargo inside the Barges. Supreme testified, through its corporate representative, Teddy Veillon, that Supreme ships every rice cargo with a cover. *See*, **Exhibit "10"** – Supreme Corp. Depo. at p. 77, lines 21-23. The "barge covers are meant to cover the barge **to protect whatever is inside it**." *See*, **Exhibit "10"** – Supreme Corp. Depo. at p. 75, lines 5-18. "You put a top on something to keep other things from getting inside of whatever you're covering." *Id.* at p. 75, lines 15-17.

Supreme requested covers on the barges ordered from SCF to protect its milled rice cargo; the covers keep weather elements out of the cargo: "That's what a cover is for…." *See*, **Exhibit "10"** – Supreme Corp. Depo. at p. 77, lines 11-19. Supreme made "it known [to SCF] that we're [Supreme] shipping a sensitive cargo and that it needs to be protected." *Id.* at p. 97,

12

lines 4-6; *see also*, *Id.* at lines 3-16. SCF knows what's in the barges. *Id.* at p. 97, lines 12-16. Supreme does **not** provide this information to fleeters such as Turn. *Id.* at p. 97, lines 20-22.

Supreme's testimony is clear: the intended purpose of covered hopper barges was to transport its sensitive milled rice cargo under cover; protected from weather elements.[3] The Barges were specifically ordered for the purpose of transporting milled rice cargo. SCF advertises that only certain of its barges can transport milled rice due to the sensitivity. However, if the Barges had been fit for their intended purpose – to protect the milled rice cargo – then the airborne coal dust would have been prevented from contaminating Supreme's milled rice.

Supreme does not intend for its milled rice to become contaminated while in the SCF Barges. *See*, **Exhibit "10"** – Supreme Corp. Depo. at p. 95, lines 6-25; p. 96, lines 11-19. Despite Supreme's testimony that the covers requested from SCF to cover its sensitive cargo, SCF, in response to Turn's Interrogatory No. 14, alleges that barge covers are not "intended as a protection against dust from coal or petroleum coke…." *See*, **Exhibit "1"** – SCF's Answer to Turn's Interrog. No. 14. Therefore, based on Supreme's testimony, the Barges should have protected its milled rice; the covers were specifically ordered by Supreme to keep things from getting into the hopper compartment. Such was the intended purpose. However, Supreme's milled rice became contaminated while in the Barges. This is undisputed. And because the airborne contaminant was permitted to enter the Barges, beneath the Barges' covers and cargo doors, the Barges were unseaworthy.

### IV.  Turn Did Not Know the Barges Transported Milled Rice.

Supreme alleges that prior to the Barges' arrival at Turn's MG Fleet, Turn "knew" that the Barges transported milled rice. Turn denies this allegation.

---

[3] Supreme attempts to argue that wind is not a weather element (R. Doc. 62); this assertion defies elementary science.

13

Supreme cites two Exhibits from an expert deposition to support this allegation. Each appears to be an email from an SCF employee to Turn's barge dispatch. *See*, (**R. Doc. 62**-Exhibit 8). However, Turn denies that it ever received these correspondences.

Turn's IT Director, Jeffrey Griswold, attested in the accompanying Affidavit that neither Turn nor its dispatcher, Katie Lepine, received either of those two emails that Supreme and SCF allege evidences Turn's 'knowledge.' To be clear: Turn has **no** record of receiving these emails on its computer servers. *See*, **Exhibit "11"** – Affidavit of Jeff Griswold. Such begs additional questions as to the authenticity of those correspondences.[4]

Regardless of the correspondences' authenticity or the shear lack of proof that these correspondences were received by Turn, the emails **do not** state that the Barges contained "milled rice." In fact, the emails have no information declaring the cargo in each Barge. *See*, (**R. Doc. 62**- Exhibit 8). Supreme alleges that the acronym "LGMR," in an unidentified column, without any heading, decipher, key or other such designation, constitutes Turn's only 'notice' that these Barges contained "milled rice." However, this allegation is based on assumption. Such appears to be a common theme in this case.

Turn operated two fleet boats in the MG Fleet on April 6, 2019. The SIR BARTON was the lead boat and fleeted the Barges in Turn's MG Fleet. Both Captains aboard the SIR BARTON testified that they did not know that these Barges transported milled rice at the time of fleeting. More importantly, both Captain Ancar and Captain Daigle denied knowledge as to the meaning of the acronym "LGMR." *See also*, **Exhibit "12"** – Depo. Capt. Ancar at p. 35, lines 1-5; *see also*, **Exhibit "13"** – Depo. Capt. Daigle at p. 29, lines 21-24.

---

[4] *See also*, Section II wherein Supreme's chemist, Mr. Moore, "reinterprets" his 2019 analysis, more than 2 years later, at the request of Supreme's representatives.

4848-9212-0301 v1

Supreme has failed to offer evidence to suggest that (1) Turn knew these Barges contained milled rice; (2) that Turn knew that the acronym "LGMR" means milled rice; and (3) that Turn received these correspondences. These issues of fact remain in dispute.

Further, Supreme alleges that Turn inspected the Barges upon arrival. However, Supreme did not explain that Turn's inspection was limited to a walk-around of the Barges' perimeter. The inspection was limited to a determination as to whether the Barges themselves had physical damage. The Barges' cargo was never inspected by Turn upon receipt of the Barges into its fleet.

Turn testified, through its corporate representative, Gena Wilson:

> Q: Now, I've dealt with a lot of fleeting companies, and often when they take control of a barge, they do some kind of inspection of it to make sure it's – it's fit to take into the fleet. Does Turn Services do anything like that?
>
> A: Yes, the deckhand [from Turn's fleet boat] does a walk-around, checks all the wing tanks for water. Normally looks for any kind of fresh damage ….
>
> Q: So if there's any damage or problem with **the barge**, Turn wants to know about it at the time it takes custody of it, right?
>
> A: Correct.

*See*, **Exhibit "14"** – Turn Corp. Depo. at p. 52, lines 9-24. Based on Turn's testimony, it did not inspect the cargo in the Barges; Turn's personnel inspect the *barge* for physical damage and water intrusion. Specifically, Turn's deckhands check the barge wing tanks for water. If damage or excessive water is identified, which could result in the barge sinking, Turn's deckhands notify the Captain of their respective fleet boat; the Captain then reports the damage to Turn's dispatchers. *Id.* at p. 54, lines 11-16; *see also*, **Exhibit "12"** – Depo. Capt. Ancar at p. 35, lines 1-5; *see also*, **Exhibit "13"** – Depo. Capt. Daigle at p. 29, lines 21-24.

Turn did not identify any sinking dangers associated with the Barges upon receipt from SCF's contracted line boats. Thus, Turn fleeted the barges without instruction. Turn only knew

15

that these Barges contained some type of rice. *See*, **Exhibit "14"** – Turn Corp. Depo. at p. 213, lines 13-16. However, Turn did not inspect Supreme's **cargo** upon fleeting the Barges.

Neither Supreme nor SCF inspected the Barges after loading. In fact, the only party that allegedly inspected the Barges prior to loading the milled rice cargo was the Federal Grain Inspection Services; however, Supreme does not know who actually performed the pre-load survey in March 2019. *See*, (**R. Doc. 1, ¶ 6**); *see also* **Exhibit "14"** – Supreme Corp. Depo. at p. 27, lines 13-19.

No party to this lawsuit inspected the Barges after they were loaded. Only after Supreme instructed representatives of RMG to inspect the milled rice on April 17, 2019 did any party to this lawsuit realize that a contamination event had allegedly taken place. To date: no party can definitively state where or when this alleged contamination occurred.

Note: "a barge owner has a 'continuing and nondelegable duty' to deliver a seaworthy barge to a fleeter." *M/V Admiral Bulker v. United Bulk Terminals Davant*, 397 F. Supp. 3d at 835. SCF was required to ensure that its Barges were fit to protect Supreme's milled rice cargo; however, SCF failed to perform any inspections of its Barges post-loading. Instead, SCF admittedly delegated its obligation to third-party towers whose identify remains unknown.

Therefore, a material fact remains in dispute: whether Turn knew that these Barges contained milled rice.

### V. Turn Did Not Violate Its Standing Order.

Supreme alleges that Turn violated its Standing Fleet Order: "DO NOT PUT **MILLED RICE** BARGES CLOSE TO **COAL BARGES**." (emphasis added). However, Supreme has failed to prove the source of contamination.

The standing order has two key parts that limit its application: (a) milled rice; and (b) coal barges. The order does not apply to every kind of rice barge; it only applies to **milled rice** barges. There are at least five types of rice transported on the Mississippi River. *See*, Exhibit "14" – Turn Corp. Depo. at p. 44, lines 6-8. Secondly, the order only applies to coal barges. The order does not apply to petcoke barges. Coal is not petcoke. Therefore, petcoke barges are not coal barges.

Turn testified, through its corporate representative, that this standing order came about due to a prior compliant that it received from another barge line:

> Q: And why was that a standing order?
>
> A: Well, we had had an incident where a barge line had called and complained that some **coal dust may have flew over from one of the coke terminals** or --- there's two coke terminals, one of the largest in the United States that's directly across the river from us, and then there's another large one that's just below us [Turn's MG Fleet].
>
> And they have mountains of coal that's just out on the pad. Plus the fleet across the river [from Turn's MG Fleet] has all these open cover barges with coal in it.
>
> So we didn't know where the coal dust was coming from, but they had complained on this specific product, milled rice, which we rarely ever got [in the MG Fleet], that sometimes the dust might get in under the covers.

*See*, **Exhibit "14"** – Turn Corp. Depo. at p. 40, lines 9-25. From the testimony, it is clear that Turn received a prior complaint from a non-party barge owner that coal entered its barges beneath its barge's covers, which impacted their milled rice cargo. The source of contamination was unknown; however, it was suspected that the coal dust originated from either of the two large coal/petcoke terminals across the River from and adjacent to Turn's MG Fleet.

Turn testified that this standing order for guidance of its Fleet Boat captains. *See*, **Exhibit "14"** – Turn Corp. Depo. at p. 264, lines 4-12. Furthermore, violation of a company policy does

17

not equate to negligence or a violation of law. See, *In re: Diamond B Marine Serv's., Inc.*, 2001 WL 1164914, * 16 (E.D. La. Sept. 28, 2001) (Clement, J.) (the court held that having a Mate at the wheel instead of the Captain may have violated company policy, but it was <u>not</u> a violation of law or negligence *per se*).

Additionally, Supreme alleges that additional barges, beyond the three at issue in this lawsuit, were contaminated in Turn's fleet. However, Turn testified that no claims were submitted. *See*, **Exhibit "14"** – Turn Corp. Depo. at p. 225, lines 25; p. 226, lines 1-3.

Turn has limited permitted space within which to operate its fleet. *Id*. at p. 43, lines 18-23. Turn must also continuously adapt to the ever-changing Mississippi River conditions and South Louisiana's weather. Both impact Turn's ability to fleet. In April 2019, Turn testified that the fleet was "packed full." *Id*. The fleet was operating under very high river conditions, which limited shifting of barges. *Id*.

Therefore, given that Turn proved that the barges Supreme and SCF allege contaminated the milled rice were, in fact, loaded with petcoke, not coal, Turn did not violate its standing order. *See*, **Exhibit "9"** - MG Transport Surveys – TURN 1353-1360. More importantly, Turn did not know that these Barges transported milled rice. Turn did not have a duty to protect the Barges' cargo of milled rice.

### VI. <u>Conclusion.</u>

Supreme's Motion for Summary Judgment (**R. Doc. 62**) should be denied; various material facts remain in dispute, which include the following:

1. Turn's knowledge of the cargo transported in the Barges at the time of fleeting;
2. Actual receipt of certain emails from SCF to Turn;
3. The two survey reports from Supreme's experts, Ms. Gillespie and Mr. Hobbs; each was drafted without an onsite survey or prior to the performance of a survey;
4. Mr. Moore's 'reinterpretation' of his 2019 chemical analysis;
5. The source of the coal dust;

18

6. The identity of the contaminant; and
7. That the SCF Barges were unseaworthy.

Supreme alleges that Turn breached its duty of care as a fleeter of barges; however, Supreme has failed to submit evidence that Turn agreed to protect its milled rice cargo. Turn's duty is limited to the barge – to securely moor it. *See*, (**R. Doc 57**).

WHEREFORE, Turn Services, L.L.C. requests that this Court deny Supreme's Motion for Summary Judgment against Turn (**R. Doc. 62**) and, instead, grant its pending Motion for Summary Judgment against Supreme (**R. Doc. 57**).

Respectfully submitted:

*/s/ R. Chauvin Kean*
Michael A. McGlone, (#9318)
R. Chauvin Kean, (#36526)
**KEAN MILLER LLP**
First Bank and Trust Tower
909 Poydras St., Suite 3600
New Orleans, LA 70112
Telephone: (504) 585-3050
Facsimile: (504) 585-3051
mike.mcglone@keanmiller.com
chauvin.kean@keanmiller.com

***Attorneys for Turn Services, L.L.C.***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to those who are non-CM/ECF participants.

New Orleans, Louisiana, this 9th day of June, 2021.

*/s/ R. Chauvin Kean*
**R. CHAUVIN KEAN**

4848-9212-0301 v1